UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PARIS MICKLE | No. 20 CR 280-1<br><br>Judge Andrea R. Wood |

**GOVERNMENT'S SENTENCING MEMORANDUM
AND OBJECTION TO PRESENTENCE INVESTIGATION REPORT**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby submits its sentencing memorandum. For the reasons set forth below, the government asks the Court to impose a sentence within the applicable Guidelines range of 21 to 27 months' imprisonment and a three-year term of supervised release.[1]

**I.   BACKGROUND**

As stated in the PSR and Government's Version of the Offense ("GVO"), on June 2, 2020, during a period of civil unrest in the Chicago area following the murder of George Floyd, defendant Paris Mickle conspired with a group of individuals, including co-defendant Tahkisha Hodge, to attempt to steal money from the PNC Bank automated teller machine located at 8700 South Cottage Grove, Chicago, Illinois (the "PNC Bank ATM"), in violation of Title 18, United States Code, Section

---

[1] As stated in Section II below, the government objects to the total offense level computation set forth in the Presentence Investigation Report ("PSR") because it includes a two-level dangerous weapon enhancement that the government believes should not be applied in this case.

2113(b), all in violation of Title 18, United States Code, Section 371. R. 75. Beginning at approximately 1:50 a.m. and continuing for about the next 30 minutes, Mickle and his co-conspirators attacked the PNC Bank ATM with, among other things, a lug wrench and a blow torch, and also used a chain that they connected to different vehicles and attached to the PNC Bank ATM in repeated attempts to break open the machine. PSR ¶¶ 8-12; GVO at 1-2.

Their attempted theft of the money inside the PNC Bank ATM was captured by the bank's surveillance cameras, and that surveillance footage shows that Mickle arrived at the PNC Bank ATM at approximately 2:05 a.m. and immediately began working with his co-conspirators to try to break into the machine, first using what appears to be a lug wrench.[2] *Id*. A few moments later, Mickle took a lit blue blow torch from an unknown co-conspirator ("Co-Conspirator A") and used it on the PNC Bank ATM to try to break into the machine. *Id*. Mickle and his co-conspirators left the area of the PNC Bank ATM at approximately 2:07 a.m., but Mickle returned about a minute later with the blue blow torch in hand. *Id*. Mickle had a second unknown co-conspirator ("Co-Conspirator B") light the blow torch, and Mickle again used it on the PNC Bank ATM to try to break into the machine. *Id*. Mickle then gave the lit blow torch to Co-Conspirator B so that Co-Conspirator B could use it on the

---

[2] As correctly noted in the Probation Office's sentencing recommendation, the surveillance footage shows that Mickle was not the first person to attack the PNC Bank ATM, and in fact, the ATM's outdoor shell was already damaged when Mickle and the other co-conspirators approached it and began attacking it with various tools at approximately 1:50 a.m. Nevertheless, the surveillance footage shows increasing damage to the PNC Bank ATM as a result of Mickle's and his co-conspirators' attacks on the machine. PSR ¶ 24.

PNC Bank ATM. *Id.* At approximately 2:09 a.m., Mickle again used the lit blow torch on the PNC Bank ATM for the next several minutes to try to break into the machine.

At approximately 2:21 a.m., a black sports utility vehicle (SUV) drove up next to the PNC Bank ATM. *Id.* Mickle communicated with the driver of the SUV, who was co-defendant Hodge, to get the SUV in the proper position so that other co-conspirators could attach a chain that had been connected to the ATM to the rear of the SUV. *Id.* Mickle then gestured with his hands for Hodge to drive forward, which she did. *Id.*

Mickle and his co-conspirators continued to attempt to break into the PNC Bank ATM without success until Chicago Police Department officers arrived on the scene at approximately 2:22 a.m. *Id.* Upon seeing the police, Mickle jumped into the backseat of the SUV, and Hodge drove the SUV in reverse through the bank parking lot and down a street in an attempt to get away. *Id.* Chicago Police officers arrested Mickle moments later after the officers saw him walking away from the area of the PNC Bank ATM. *Id.*; PSR ¶ 83. The officers tried to stop Mickle, but Mickle fled on foot before the police apprehended him in a nearby backyard. *Id.*

At the time of the attempted theft on June 2, 2020, the PNC Bank ATM contained approximately $53,176 in U.S. currency, which was in the care, custody, control, management, and possession of PNC Bank, National Association, the deposits of which were then insured by the Federal Deposit Insurance Corporation. PSR ¶ 11; GVO at 2, Ex. A. Furthermore, PNC Bank later determined that the PNC

Bank ATM was damaged beyond repair based in part on the actions of Mickle and his co-conspirators and consequently removed and replaced the machine with a different ATM at a cost of approximately $62,818. *Id.*

On June 5, 2020, Mickle was charged by complaint with conspiracy to commit bank theft. R. 1. On June 17, 2020, a grand jury returned an indictment against Mickle and his co-defendant, charging them with conspiracy to commit bank theft. R. 19. On July 9, 2021, Mickle pled guilty to that charge, and he is scheduled to be sentenced by this Court on October 8, 2021. R. 71.

## II.    GUIDELINES CALCULATION

### A.    The Adjusted Offense Level Prior to Acceptance Should be 12, not 14.

The government disagrees with the adjusted offense level computation set forth in the PSR because it includes a two-level dangerous weapon enhancement under Guideline § 2B1.1(b)(16)(B). As an initial matter, the Probation Office correctly noted that the base offense level in this case is 6 pursuant to Guideline §§ 2X1.1(a) and 2B1.1. PSR ¶ 20. The Probation Office also correctly determined that the base offense level should be increased by 6 levels under Guideline § 2B1.1(b)(1)(D) to 12 because the actual loss associated with the replacement of the PNC Bank ATM ($62,818) was more than $40,000 but less than $95,000. *Id.* ¶ 21.[3]

---

[3] The Guidelines provide that, in calculating the offense level for economic offenses, a court should increase the offense level by the loss amount, which is "the greater of actual loss or intended loss." Guideline § 2B1.1, Application Note 3. Here, the actual loss was PNC Bank's expense to replace the damaged ATM, which was $62,818, and it is greater than the intended loss. Nevertheless, even if the intended loss amount was used in this case, which was $53,176 (the amount of money in the ATM at the time of the attempted theft), the base offense level still would be increased by 6 levels

However, the Probation Office also included a two-level dangerous weapon enhancement under Guideline § 2B1.1(b)(16)(B) that this Court should not apply. *Id.* ¶ 22. The Court's assessment of the appropriateness of applying the dangerous weapon enhancement should begin with the text of the relevant Guidelines provisions and their application notes. *United States v. Cook*, 850 F.3d 328, 332 (7th Cir. 2017). Here, under Guideline § 2B1.1(b)(16)(B), the offense level can be increased by two levels if "the offense involved" the "possession of a dangerous weapon (including a firearm) in connection with the offense." In relevant part, the Guidelines define "dangerous weapon" as "an instrument capable of inflicting death or serious bodily injury." Guideline § 1B1.1, Application Note 1(F).

The plain meaning of the relevant Guidelines provisions supports the application of the two-level dangerous weapon enhancement because a lit blow torch is plainly an instrument capable of inflicting serious bodily injury. PSR ¶ 22; *United States v. Sturman*, No. 93 CR 167, 1994 WL 282260, at *7 (N.D. Ill. June 22, 1994) (finding that hammer used to vandalize store was a "dangerous weapon" under Guideline § 1B1.1). And the offense in this case involved Mickle's possession and use of that instrument to try to break into the PNC Bank ATM. Mickle's offense therefore involved the possession of a "dangerous weapon" under Guideline § 2B1.1(b)(16)(B).

Yet, while the plain meaning of the relevant Guidelines provisions supports application of the two-level enhancement, the nature and circumstances of the offense

---

under Guideline § 2B1.1(b)(1)(D) because the intended loss was more than $40,000 but less than $95,000.

5

counsel against its application as to Mickle. Mickle's possession of the lit blow torch did not involve his use of that instrument around anyone other than his co-conspirators. And his use of that instrument was directed towards the PNC Bank ATM, not any person. Furthermore, when law enforcement arrived on the scene, Mickle did not attempt to use that (or any other) instrument to threaten or harm the officers. Given those circumstances, the government submits that the two-level dangerous weapon enhancement should not be applied in calculating Mickle's offense level, and the adjusted offense level prior to acceptance should be 12.

### B. Criminal History Category Calculation

The government agrees with the Probation Office's finding that Mickle has 10 criminal history points and falls in criminal history category V. PSR ¶¶ 34-53.[4]

### C. Advisory Guidelines Range

With a two-level reduction for acceptance of responsibility (*id.* ¶ 30), the total offense level is 10, which with a criminal history category of V, results in an advisory range of 21 to 27 months' imprisonment.[5]

---

[4] In calculating Mickle's criminal history category, the Probation Office correctly accounted for three prior convictions that Mickle had that the undersigned was not aware of prior to reviewing the PSR. *Id.* ¶¶ 44-45, 49.

[5] In the event this Court decides to apply the two-level dangerous weapon enhancement to the adjusted offense level, the government agrees with the Probation Office's calculation that with a two-level reduction for acceptance of responsibility, the total offense level is 12, which with a criminal history category of V, results in an advisory range of 27 to 33 months' imprisonment. *Id.* ¶ 119.

## III. APPLICATION OF THE SENTENCING FACTORS

Section 3553(a) requires this Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. 18 U.S.C. § 3553(a). Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* § 3553(a)(2)(A)-(D).

In order to determine the sentence to impose, the Court must consider the statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements. *Id.* § 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007). For the reasons set forth below, consideration of the § 3553(a) factors reveals that a sentence within the Guidelines range of 21 to 27 months' imprisonment, along with a three-year term of supervised release and restitution in the amount of $62,818, is warranted and necessary.

### A. Term of Imprisonment

Considering the factors set forth in 18 U.S.C. § 3553(a), the government recommends a sentence of incarceration within the applicable Guidelines range of 21 to 27 months' imprisonment. Such a sentence is sufficient, but not greater than

7

necessary, to reflect the seriousness of Mickle's offense, promote respect for the law, provide just punishment, and afford adequate deterrence, for *three* primary reasons.

*First*, a sentence within the applicable Guidelines range would reflect the seriousness of the offense. Mickle conspired with others to steal money from an ATM in the middle of the night during a period of civil unrest following the murder of George Floyd. This brazen offense caused irreparable harm to the ATM and required PNC Bank to replace the machine at a cost of approximately $62,818. But the seriousness of Mickle's offense extends further. The attempted looting by Mickle and the others during the days following the death of George Floyd required the expenditure of a significant amount of public resources. Furthermore, the looting caused reputational harm to the City of Chicago; undercut the message of peaceful protestors; and shook many Chicago residents' fundamental sense of security and faith in society. Mickle's offense therefore is very serious.

*Second*, a sentence within the applicable Guidelines range is necessary to provide adequate deterrence. As to specific deterrence, Mickle's background clearly demonstrates that he does not respect the law and there is a substantial risk that he will break the law again in the future. As set forth in the PSR, Mickle is no stranger to the criminal justice system. PSR ¶¶ 34-83. He has engaged in a pattern of criminal activity since he was approximately 15 years old. *Id.* While the offenses have varied in their severity (*e.g.*, drug possession and distribution offenses, domestic battery, and criminal trespassing), taken together, they reflect a serious disregard for the law that has not been abated by age (Mickle is now 30 years old) or parenthood (Mickle

has a ten-year-old son). Furthermore, Mickle committed the instant offense on June 2, 2020, while he was on parole for a conviction for manufacture/delivery of heroin that resulted in a sentence of three years' imprisonment. *Id.* ¶ 52. And after he was charged in this case, Mickle repeatedly failed to comply with the Court-ordered conditions of release, resulting in four violation reports and his voluntary surrender into federal custody on March 26, 2021, approximately four months prior to entry of his guilty plea. *Id.* ¶¶ 3-4; Probation's Sentencing Recommendation at 3. The sentence imposed in this case should therefore aim to try to end Mickle's pattern of criminality.

On the issue of general deterrence, while Mickle is being held accountable in this case, there are many others who engaged in similar activity who have escaped prosecution, including many of Mickle's co-conspirators. The sentence in this case should also aim to deter those individuals and others who believe they can loot with impunity.

*Third*, Mickle's background, which provides both aggravating and mitigating circumstances, supports a sentence within the applicable Guidelines range. Mickle grew up in a family where both of his parents were involved in his upbringing even though they did not live together during his formative years. PSR ¶ 86. Mickle reported that he was a "regular neighborhood child" who attended school and played sports; he was provided with adequate food, shelter, and clothing during his childhood; he did not experience any abuse or neglect; and he had good relationships with his parents and siblings. *Id.* ¶¶ 86-90. That family remains supportive of

Mickle, and his upbringing and family appear to have given him the opportunity to have a productive and law-abiding life. *Id.* But Mickle took a different path. His father was imprisoned when Mickle was 14 years old, and around that same time, Mickle became involved in a street gang and dropped out of school. Sentencing Recommendation at 2; PSR ¶¶ 95, 108-10. Starting from around the time he was 13 years old, Mickle's decisions have led to numerous arrests and convictions for a variety of offenses. *Id.* ¶¶ 34-75. Notably, Mickle's offenses have repeatedly endangered himself and the public (drug offenses), as well as individuals he knows (domestic battery). *Id.* While the absence of his father during his teenage years and possible substance abuse issues may have contributed to some of Mickle's criminal activity, they cannot entirely explain his approximately 24 arrests and 10 adult criminal convictions over the course of approximately two decades. *Id.* ¶¶ 34-95. That history reflects a fundamental unwillingness to abide by the law. Mickle's decision to flout the law yet again in the instant offense, particularly while he was on parole for a 2017 drug conviction, warrants a Guidelines sentence.

    **B.**    **Supervised Release**

The Court may impose a term of supervised release of not more than three years in this case. *Id.* ¶ 121. The government agrees with the Probation Office that this Court should impose a three-year term of supervised release. A district court must justify the conditions and the length of a term of supervised release by an adequate statement of reasons, reasonably related to the applicable § 3553(a) factors. *See United States v. Kappes*, 782 F.3d 828, 845 (7th. Cir. 2015). In this case, a three-year term with the conditions proposed by the Probation Office is appropriate because

10

of the need to provide adequate deterrence and to protect the public from further crimes by Mickle, particularly given the above-described history and characteristics.

### C. Restitution

Pursuant to 18 U.S.C. § 3663A, the Court also should order Mickle to pay $62,818 to PNC Bank, which represents the cost to PNC Bank to replace the damaged ATM, with Mickle being jointly and severally liable to the bank for that amount with co-defendant Hodge.

## IV. CONCLUSION

For the foregoing reasons, a sentence within the applicable Guidelines range of 21 to 27 months' imprisonment, along with a three-year term of supervised release, restitution in the amount of $62,818, and a $100 special assessment, is fair, reasonable, and sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: /s/ *Prashant Kolluri*
PRASHANT KOLLURI
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300